C. M. REEL AND WINNIFRED L. REEL, PLAINTIFFS AND RE-SPONDENTS, *v.* WILLIAM R. WALTER, DEFENDANT AND APPELLANT.

No. 9318.
Submitted February 28, 1957. Decided April 24, 1957.
As Amended May 6, 1957.
309 Pac. (2d) 1027.

Mr. Lyman H. Bennett, Jr., Bozeman, Mr. Chester Lloyd Jones, Virginia City, for appellant.

Messrs. Doepker & Hennessey, Butte, Mr. Frank E. Blair, Virginia City, for respondents.

Mr. Jones, Mr. Bennett, Mr. Blair and Mr. Mark J. Doepker argued orally.

MR. JUSTICE CASTLES:

This is an appeal from a judgment quieting title in certain described land in respondents, plaintiffs in the district court. The respondents sought to quiet title to land owned by them in Madison County, and as incidental relief sought the establishment of the boundary between the property of themselves and the appellant Walter. The controversy centered around a determination of the boundary between the northeast and the southeast quarters of Sec. 28, T. 2 S, R. 2 W. of M.P.M.

Appellant claimed that a fence was the boundary line, while respondents claimed that the quarter section line running from east quarter corner of said section 28 to the west quarter corner of the said section was the division line between the respective parties.

Respondents established the quarter section line by means of plats and surveys of one Matthew, a licensed surveyor and engineer, who had been employed for that purpose. The line as established by respondents' witness, the surveyor, was south of the fence line claimed by appellant as the boundary. The area involved was 8.13 acres in a long strip between the fence and the quarter section line established by the surveyor.

Upon the trial, the respondents produced testimony on the survey and plats establishing the actual governmental division of the land. The appellant pressed the claim on the grounds that (1) the reestablishment of government corners and thus the survey line, as carried out by the respondents' surveyor, was improperly accomplished; and (2) that usage, custom and acquiescence by the respondents, appellant, and their predecessors in interest had created a practical boundary, consisting of the aforementioned fence, between the two properties.

Documentary proof of the chains of title to the property of both parties was introduced. In both chains of title, the land involved had been conveyed by legal subdivision according to

the government survey. The chain of title of appellant revealed that in addition to the legal description, that is, the southeast quarter of Sec. 28, T. 2 S, R. 2 W. M.P.M., appeared the words: "subject to any state of facts an accurate survey may show."

Appellant's case consisted mainly of an attack on the method of the survey, and testimony as to the location and notoriety of the division fence between the properties. Also, the appellant produced testimony showing improvements on the strip in question, consisting of a barn some fifty years old, and a small brooder house and as to a long continued use of them. It appears from the record that the appellant had also had a survey made, but did not produce the surveyor or any testimony concerning the survey in contradiction to that of the respondents.

There was no controversy as to the ownership of the buildings situated on the contested strip. The respondents acknowledged that the appellant owned them and the trial court so found.

The appellant's specifications of error are encompassed in the two aforementioned claims. Two questions are posed:

(1) Was the survey properly conducted so that the trial court could properly find the quarter section line between the northeast and southeast quarters of Sec. 28; and (2) was there a boundary, consisting of a fence, established by usage, custom and acquiescence?

At the time the surveyor went upon the ground, the situation was that:

(1) The northeast section corner marker had been obliterated, the east quarter section corner marker had been obliterated, and the southeast section corner marker had been obliterated. In short, all corners of the east side of the said section had been obliterated.

(2) The northwest corner of Sec. 28 "was a stone in place properly marked and witnessed." The southwest corner of the said section "was a stone in place and the regulation U.S. brass caps and marks." The north quarter corner marker of said section was in place, and the surveyor used the northwest corner in place and the north quarter corner to project the north line

of the section to the northeast corner thereof. These were the United States Government established corners upon the ground. At the northeast corner, the surveyor found a fence corner at the intersection of the line so projected from the northwest corner of the section to the northeast corner thereof, as previously indicated, with the east section line. There the fence was very old, a few rotten posts were all that remained. A pile of sand was near the northeast corner, but the marked stone had been used as a brace against one of the posts of the fence.

The surveyor used the intersection of four fences as his original approach to the re-establishment of the southeast corner of the section. These fences were all in proper relation to the course of the section. By projecting this line northerly it intersected the northeast corner with but slight error, i. e., the old fence corner previously referred to. The surveyor checked his work with the transcript of original survey field notes of the United States Government survey, a copy of which was introduced in evidence without objection. All of the surveyor's work was done pursuant to instructions of the Bureau of Land Management, and he testified that he followed the rules of the Manual of survey as established by the said Bureau.

That left for consideration two markers of said Sec. 28, namely, the south and west quarter corners. It was of evidence that the north to south center line was on a fence line, and checking from the three fence corners the measurements given to Willow Creek by the original United States Government survey notes, it agreed very closely with the present position of the fence corner so the fence corner was taken as the south quarter corner of the section. The surveyor located the position of the west quarter corner of Sec. 28 also. The stone could not be found, but the witness pile or witness mound was there, and the distance agreed with the original survey notes, so he used the fence corner at the witness mound for the west quarter corner of said section.

After having found and re-established the west quarter corner as heretofore mentioned, as well as having re-established the east

quarter corner, the surveyor's line connected from the west quarter corner to the east quarter corner as shown on the surveyor's plat which was received in evidence and considered by the trial court.

The appellant concedes that the Bureau of Land Management manual contained the proper procedure. This court has previously held in Vaught v. McClymond, 116 Mont. 542, 155 Pac. (2d) 612, that such procedure is proper.

The appellant contends, however, that the procedure as to *lost* quarter corners was not followed. The surveyor had treated the corners as *obliterated* corners and had followed the method of single proportionate measurement between the section corners to establish the quarter corners. For the purpose of this opinion, we do not think it necessary to go into a lengthy explanation of the difference between lost and obliterated corners and the methods used to re-establish them. Suffice it to say that the trial court had before it the testimony of the respondents' surveyor and the survey notes and plat prepared by him, together with the original government field notes. There was sufficient evidence before the trial court to support the finding that the survey had been properly made and the lines properly located.

As was said by this court in Myrick v. Peet, 56 Mont. 13, at pages 22 and 23, 180 Pac. 574, at page 577:

"The court below, short of being actually upon the ground, following step by step the witnesses in examining the monuments which the surveyors testified bore the official stamp of identification, was in a peculiarly advantageous position to get the psychological effect of the testimony given by the witnesses. They were all fresh from the *locus in quo,* and gave the court first impressions by pointing out upon the maps the objects by which the definite location of the monuments could be determined. Before the judgment of the court below reached by such means, and presumptively correct, can be impeached, it must be made clearly to appear that some fact properly for the consideration of the jury was arbitrarily determined by the court * * *."

It appeared from the record that the appellant had a survey ▆ made also, but he did not produce any evidence of that survey at the trial. If there was any disagreement between the result obtained by respondents' surveyor as discussed above and the appellant's surveyor, it could have been demonstrated.

R.C.M. 1947, section 93-2001-1, provides: "7. That if weaker and less satisfactory evidence is offered, when it appears that stronger and more satisfactory was within the power of the party, the evidence offered should be viewed with distrust."

Where, as here, the trial court had before it the testimony of a licensed surveyor and engineer; and the appellant failed to produce evidence of his own surveyor to dispute it; the trial court was justified in finding the survey correct, establishing the quarter section line between the northeast and southeast quarters of section 28.

The second question posed, as to whether a boundary was established by usage, custom and acquiescence will next be considered. The trial court found in its findings of fact these matters:

"The respondents learned and ascertained the true boundary line between the northeast and southeast quarter of section twenty-eight, Township Two South, Range Two West * * * at or about the time of the initiation of this action upon * * * having had a land survey made * * * and a plat prepared. * * *

"That prior to said land survey * * * the parties to this action and their predecessors had supposed that the fence shown on the plat of said survey was upon the half section line dividing the northeast and southeast quarters of said section * * * and all of the land transfers of the plaintiffs and their predecessors in interest recognized the half section line dividing the northeast and southeast quarters of said section * * * as the true division line between the farm of the plaintiffs in the northeast quarter and that of the defendant in the southeast quarter of the said section.

"Moreover, neither of the parties to this action nor their

predecessors, while believing the true division or boundary line between the northeast and southeast quarters of section 28, in question here, to be uncertain ever at any time or at all fixed by any agreement whatsoever a boundary line between the lands now owned by the plaintiffs or respondents in the northeast quarter and lands of the defendant and appellant in the southeast quarter of said section twenty-eight but upon the contrary supposed the said fence to be upon the true boundary line as fixed by the official government survey of said section, until about the time this action was commenced.

"Upon learning the location of the true boundary line between the lands of the parties to this action the plaintiffs (respondents here) moved quickly and with dispatch to initiate this action in the trial court."

As previously mentioned, the fence line had been in existence for many years. On the plat, introduced in evidence, it appears as a fence slanting from the east section line in a southwesterly and westerly direction along a county road. It contains two pronounced jogs. No written or oral agreement as to its being the boundary between the parties was introduced. The appellant contends that usage, custom and acquiescence established it as the true boundary.

Again in Myrick v. Peet, supra, it was said:

"It is also well settled that where two adjoining proprietors are divided by a fence which they suppose to be the true line, they are not bound by the supposed line, but must conform to the true line when ascertained. Jacobs v. Moseley, 91 Mo. [457] 462, 4 S.W. 135; Schraeder Min. & Mfg. Co. v. Packer, 129 U.S. 688, 9 S. Ct. 385, 32 L. Ed. 760; 4 Am. & Eng. Ency. of Law, 866, and cases cited; Kimes v. Libby, 87 Neb. 113, 126 N.W. 869; Foard v. McAnnelly, 215 Mo. 371, 114 S.W. 990; Voigt v. Hunt (Tex. Civ. App.), 167 S.W. 745; Janke v. McMahon, 21 Cal. App. 781, 133 Pac. 21; Lind v. Hustad, 147 Wis. 56, 132 N.W. 753."

This rule was reaffirmed in Schmuck v. Beck, 72 Mont. 606, at page 616, 234 Pac. 477, at page 481.

Again, quoting from Myrick v. Peet, supra, 56 Mont. at page 25, 180 Pac. at page 578:

"The burden of proof is always upon the party attempting to show the existence of an agreement fixing the location of a boundary line, and that the boundary so fixed had been accepted and acquiesced in. 4 R.C.L., title, Boundaries, section 66; Jones v. Pashby, 67 Mich. 459, 35 N.W. 152, 11 Am. St. Rep. 589."

Here the appellant's title shows that his deed is from his father and mother. His father and mother received a deed to the same property, dated in 1944. Both deeds described the southeast quarter of section 28, and said that the deed is "subject to any state of facts an accurate survey may show * * *."

The deed of the predecessors was the same. All the documentary evidence of the chain of title shows transfers by legal subdivisions. Not once is a fence used as a boundary line.

It is not contended by the appellant that there was ever a written or oral agreement that a fence line was a boundary. They contended that there was an acquiescence amounting to an implied agreement, contrary to the trial court's findings. The appellant cites the case of Box Elder Livestock Co. v. Glynn, 58 Mont. 561, 193 Pac. 1117, 1118, in support of his position. We have no quarrel with the rule as laid down in that case, but we simply do not have the same fact situation. As was pointed out in Box Elder Livestock Co. v. Glynn, supra, in distinguishing the Myrick v. Peet case, "upon the facts presented, it was there held that neither party claimed more than to the true line, and that occupancy was merely subject to future ascertainment of the proper location of the boundary * * *."

The evidence was very strong in this case that the appellant and his predecessors in interest knew that the boundary was "subject to any state of facts an accurate survey may show" as the deeds recited.

The appellant failed in his burden of proof to show the existence of an agreement fixing the location of the boundary line as being the fence, and that the boundary so fixed had been accepted and acquiesced in.

390

For the foregoing reasons the judgment of the district court is affirmed.

MR. CHIEF JUSTICE HARRISON and MR. JUSTICE BOTTOMLY, ANGSTMAN, and ADAIR, concur.